**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MISTWOOD PARTNERSHIP,<br><br>*Plaintiff,*<br><br>v.<br><br>DOCUSIGN, INC.,<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 26-187 |

**MEMORANDUM OPINION AND ORDER**

In this patent infringement action, defendant Docusign, Inc., has moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). D.I. 31, 32. Docusign argues that the patent claims asserted by plaintiff Mistwood Partnership are invalid under 35 U.S.C. § 101 for being directed to patent-ineligible subject matter. Mistwood has filed a response, D.I. 34, and Docusign has filed a reply, D.I. 38. Docusign has also filed a motion to stay all deadlines pending the resolution of its dispositive motion, D.I. 43, 44, to which Mistwood has filed a response, D.I. 46, and Docusign has filed a reply, D.I. 48. On October 19, 2026, I held a hearing on Docusign's motion for judgment on the pleadings. D.I. 54. For the reasons set forth below, Docusign's motion for judgment on the pleadings is denied, and Docusign's motion to stay the case is denied as moot.

## I. Background

Mistwood's complaint asserts claims from three patents it owns, U.S. Patent Nos. 8,924,495 ("the '495 patent"); 8,799,385 ("the '385 patent"); and 8,799,386 ("the '386 patent").

*See* D.I. 1 at ¶ 1. The three patents have materially the same specification[1] and are generally directed to controlling access to email and sending confirmation to the email originator of the receipt of the email by the recipient.

As explained in the specification of the ’386 patent, “[v]arious types of transport layer communication protocols are supported by wireless communication devices,” including “text messaging, short messaging service (SMS), multimedia messaging service (MMS), email such as by simple mail transfer protocol (SMTP), and instant messaging utilizing hypertext transfer protocol (HTTP).” ’386 patent, col. 1, ll. 52–57. “Each type service is supported by a transport layer communication protocol that is part of the telecommunication signaling structure associated with the transport of user communications and the communication of telecommunication infrastructure commands and signals.” *Id.* at col. 1, ll. 58–62. For email communications, the specification explains that “[s]ome, but not all, SMTP servers and email clients support the transmission of a receipt confirmation from an addressee of the email to the email originator, if the originator had requested such notice.” *Id.* at col. 1, line 65, through col. 2, line 1. The problem, however, is that “it is not mandatory that the email addressee actually send (permit) the transmission of the requested receipt confirmation, even if the addressee receives and reads the email.” *Id.* at col. 2, ll. 1–4. The object of the patented invention is thus “to provide control of the addressee’s ability to view the contents of a delivered email based on authorization of a mandatory acknowledgement confirmation to the email originator of receipt of the email, especially, but not exclusively, suited for SMTP and HTTP communications.” *Id.* at col. 2, ll. 12–17.

Claim 1 of the ’386 patent provides as follows:

[1] Mistwood concedes that the patents “are closely related” and cites only the ’386 patent in its brief in response to Docusign’s motion to dismiss. *See* D.I. 34 at 3 n.1. I will do the same.

> 1. A method implemented by a first end-user communication device for processing the receipt of an email, the method comprising:
>
> receiving the email that comprises a digital packet having a header and a user data segment, the user data segment containing a user message and an acknowledgement command where the acknowledgement command conveys a request from an originating device to acknowledge receipt of the subject email;
>
> preventing the display on a screen of the first end-user communication device of content of the received user message until input on the first end-user communication device is entered authorizing a reply to the acknowledgement request;
>
> upon receiving the input authorizing the reply:
>
> > automatically generating by the first end-user communication device and transmitting a reply email with an acknowledgement to the originating device corresponding to the subject email;
>
> enabling the display of the content of the corresponding received user message on the screen of the first end-user communication device; and
>
> storing in the first end-user communication device a read message indicator having a value that represents that the reply email was authorized and the content of the received email enabled to be displayed; and wherein the email is transmitted from the originating device by using either simple mail transfer protocol or hypertext transfer protocol for delivery of the email to the first end-user communication device.

Claim 2 depends from claim 1 and adds "storing the user data segment in memory of the first end user communication device, the user data segment including a first message identifier that is assigned to the associated user message by the originating device, the reply email to the originating device including a message identifier that is the same as the first message identifier."

Claim 3 depends from claim 2 and adds the following:

> 3. The method of claim 2 wherein the user of the first end-user communication device has an email account with an associated user email address from which user emails are accessed by the first end-user communication device and other end-user communication devices, the method further comprising:
>
> upon receiving the input authorizing the reply to the acknowledgement request, automatically generating by the first end-user communication device and transmitting another email addressed to the user's email address to which the received email from the originating device was addressed, the another email

> including a message identifier that is the same as the first message identifier and a read message indicator having a value that represents that display of the content of the received email from the originating device had been enabled to be viewed,
>
> whereby the other end-user communication devices are informed upon receipt of the another email that the other end-user communication devices should treat the acknowledgement request of the subject email from the originating device as having been satisfied.

Put more succinctly, the steps of claim 1 can be summarized as follows: (1) receiving an email with an acknowledgement request; (2) restricting access to the email's content; (3) sending acknowledgement; (4) enabling the display of the email's content; and (5) creating a record of the acknowledgement. Claim 3 adds synchronizing the acknowledgement status across different end-user communication devices.

Docusign contends that all the asserted claims of the '495, '385, and '386 patents are invalid under 35 U.S.C. § 101 because, in Docusign's view, they are directed to an abstract idea and do not contain an inventive concept sufficient to render the claims patent-eligible.[2] For the reasons set forth in detail below, I disagree with Docusign.

## II. Legal Standard

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A Rule 12(c) motion "will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988) (quotation marks and citation omitted). The standard that applies to a Rule 12(b)(6) motion to dismiss for failure to state a claim also applies to motions brought under Rule 12(c); that is, in the common situation in which the defendant

[2] At the hearing on Docusign's motion, the parties clarified that the asserted claims in this case are claims 1, 6, and 11 of the '495 patent; claims 1, 7, and 13 of the '385 patent; and claims 1, 6, 9, and 11 of the '386 patent.

moves to dismiss the complaint, the court "must accept the truth of all factual allegations in the complaint and must draw all reasonable inferences in favor of the non-movant." *Revell v. Port Auth. of New York & New Jersey*, 598 F.3d 128, 134 (3d Cir. 2010). More generally, "[t]he purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 617 (D. Del. 2008).

Patent eligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). Disputes over eligibility can be, and frequently are, resolved on a Rule 12(b)(6) or Rule 12(c) motion "where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (citing cases).

## III. Patent Eligibility Under 35 U.S.C § 101

### A. Principles

Section 101 of the Patent Act defines patent-eligible subject matter. It states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has interpreted that provision to carve out exceptions to that broad characterization of patentable subject matter for "[l]aws of nature, natural phenomena, and abstract ideas." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208,

216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

The framework for determining whether a patent is directed to an unpatentable abstract idea is well settled. The Supreme Court's decision in *Alice* established the now-familiar two-step test for patentability in that context. The first step entails determining whether the claim at issue is directed to an abstract idea. *See id.* at 217. The second step entails determining whether the claim contains an "inventive concept" that removes the claimed subject matter from the realm of abstraction. *Id.* at 217–18; *see also Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 72–73 (2012).

**1. Abstract Idea**

Neither the Supreme Court nor the Federal Circuit has ventured a single, comprehensive definition of an "abstract idea." *See Alice*, 573 U.S. at 221 ("[W]e need not labor to delimit the precise contours of the 'abstract ideas' category in this case."); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) ("We need not define the outer limits of 'abstract idea' . . . ."); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2018) ("The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo*/*Alice* inquiry . . . ."). Rather than a unitary test, what has emerged from the cases applying section 101 is a group of related principles that can be applied in gauging whether a patent claim is directed to an abstract idea.

First, the courts have characterized "method[s] of organizing human activity" as abstract. *See Alice*, 573 U.S. at 220; *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018). For example, the courts have identified fundamental economic and business practices as abstract ideas. *See SAP Am.*, 898 F.3d at 1166–67; *Intell. Ventures I LLC v. Symantec Corp.*, 838

F.3d 1307, 1313 (Fed. Cir. 2016). Such business practices can include relatively specific functions such as disseminating regionally broadcasted content to users outside the region, *see Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1261–62 (Fed. Cir. 2016); classifying an image and storing the image based on its classification, *see In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016); or managing a bingo game, *see Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014).

Applying that principle to patents that claim the use of computers in performing particular activities, courts have held that simply implementing particular economic practices on a computer does not make those practices patent-eligible. *See BSG Tech*, 899 F.3d at 1285 ("If a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea at step one [of *Alice*]."); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093–94 (Fed. Cir. 2016); *TLI*, 823 F.3d at 611–12; *Enfish*, 822 F.3d at 1338–39.

Second, as applied to computer-related applications, the courts have looked to whether the claim in question is directed to an improvement in computer technology as opposed to simply providing for the use of a computer to perform "economic or other tasks for which a computer is used in its ordinary capacity." *Enfish*, 822 F.3d at 1336; *see also Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1357 (Fed. Cir. 2021); *Yu v. Apple Inc.*, 1 F.4th 1040, 1044 (Fed. Cir. 2021); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016). Where the claims at issue provide for an improvement in the operation of a computer, such as a new memory system, a new type of virus scan, or a new type of interface that makes a computer function more accessible, the Federal Circuit has found the claims patent-eligible. *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007–11 (Fed. Cir. 2018) (methods for making electronic spreadsheets more accessible); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880

F.3d 1356, 1361–63 (Fed. Cir. 2018) (improved display devices); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303–06 (Fed. Cir. 2018) (novel method of virus scanning); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258–60 (Fed. Cir. 2017) (improved computer memory system).

Third, again in the field of computer-related applications, the Federal Circuit has held that claims are directed to an abstract idea if they are "directed to collection of information, comprehending the meaning of that collected information, and indication of the results, all on a generic computer network operating in its normal, expected manner." *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022) (quoting *In re Killian*, 45 F.4th 1373, 1380 (Fed. Cir. 2022)); *see also SAP Am.*, 898 F.3d at 1167 ("[C]laims focused on 'collecting information, analyzing it, and displaying certain results of the collection and analysis' are directed to an abstract idea." (quoting *Elec. Power Grp.*, 830 F.3d at 1353–54)); *Trading Techs. Int'l, Inc. v. IBG, LLC*, 921 F.3d 1378, 1385 (Fed. Cir. 2019); *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018); *FairWarning IP*, 839 F.3d at 1093.

Fourth, and more generally, in determining whether a method claim is directed to an abstract idea, the Federal Circuit has focused on whether the claim is purely functional in nature or is sufficiently concrete or specific to be directed to a patent-eligible process rather than a patent-ineligible result. For example, in *SAP America*, the court asked whether the claim had "the specificity required to transform [it] from one claiming only a result to one claiming a way of achieving it." 898 F.3d at 1167. To answer that question, the Federal Circuit has directed courts to "look to whether the claims in the patent focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337

(Fed. Cir. 2017); *McRO*, 837 F.3d at 1314 ("We . . . look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery."); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1244 (Fed. Cir. 2016) (holding a claim that "calls for the desired result of associating a customer's order with said customer, and does not attempt to claim any method for achieving that result," is abstract, and thus ineligible for patenting); *see generally Diamond v. Diehr*, 450 U.S. 175, 182 n.7 (1981) (explaining that a patent may issue "for the means or method of producing a certain result, or effect, and not for the result or effect produced" (citation omitted)); *Le Roy v. Tatham*, 55 U.S. 156, 175 (1852) ("A patent is not good for an effect, or the result of a certain process" because such patents "would prohibit all other persons from making the same thing by any means whatsoever.").

Fifth, and relatedly, "the concern that drives" the judicial exceptions to patentability is "one of pre-emption." *Alice*, 573 U.S. at 216; *see also ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015). In determining whether a particular invention is directed to an abstract idea, it is therefore important to ask whether according patent protection to the claimed subject matter would have a broad preemptive effect on future innovation in the same field. *See Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013).

**2. Inventive Concept**

If the court determines that a claim is directed to an abstract idea, the court proceeds to *Alice* step two. That step requires the court to "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 72, 78–79).

The "inventive concept" is "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 573 U.S. at 217–18 (alteration in original) (quoting *Mayo*, 566 U.S. at 72–73). That step serves to ensure that the claim is directed to more than merely implementing an abstract idea using "well-understood, routine, [and] conventional activities previously known to the industry." *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022) (alteration in original) (quoting *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014)). That is, *Alice* step two requires the claimed invention to do more than combine known techniques that "yield[ ] only expected results," *Universal Secure Registry*, 10 F.4th at 1353; instead, it must "focus on a specific means or method that improves the relevant technology," *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022) (citation omitted). In particular, the Federal Circuit has asked whether the claim or claims at issue are "directed to a technological solution to a technological problem." *cxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1378 (Fed. Cir. 2021); *see also BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350–51 (Fed. Cir. 2016); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014).

The preemptive effect of the asserted claims is also a relevant consideration at *Alice* step two. The Federal Circuit explained the relationship between preemption and the existence of an inventive concept:

> We have explained that claims for methods that "improve[ ] an existing technological process" include an inventive concept at step two. *BASCOM*[, 827 F.3d at 1350–51 (quoting *Alice*, 573 U.S. at 221, 223]). And claims that "recite a specific, discrete implementation of the abstract idea" rather than "preempt[ing] all ways of" achieving an abstract idea using a computer may include an inventive concept. *Id.* at 1350. But claims to "an abstract idea implemented on generic computer components, without providing a specific technical solution beyond

> simply using generic computer concepts in a conventional way" do not pass muster at step two. *Id.* at 1352.

*Killian*, 45 F.4th at 1382. Thus, whether the claims recite "a specific, discrete implementation of the abstract idea" rather than preempting all implementations of that idea, is an appropriate consideration in the step two inquiry. *Id.* (citation omitted).

**B. Application**

**1. Representative Claims**

Docusign argues that "[c]laim 1 of the '386 Patent is representative of all claims in the Asserted Patents." D.I. 32 at 8. According to Docusign, the independent claims of the '495, '385, and '386 patents are all directed to the same abstract idea of providing restricted access to a message, *id.* at 8–10, and the dependent claims all "recite token post-solution limitations or elements performed, at most, by computing elements that are 'purely conventional,'" *id.* at 10–11 (citation omitted).

In response, Mistwood does not dispute that claim 1 of the '386 patent is representative of the other independent claims of the asserted patents, nor does Mistwood dispute representativeness for most of the dependent claims in the asserted patents. Mistwood contends only that "dependent claims such as Claims 3, 8, 13 of the '386 Patent and Claims 3, 8, 13 of the '495 Patent (collectively, the 'Second Email Dependent Claims') address a different technological problem through additional limitations not found in Claim 1 of the '386 Patent." D.I. 34 at 5. In elaborating on that argument, however, Mistwood substantively addresses only the difference between claim 1 and claim 3 of the '386 patent. *See id.* at 5–9.[3]

[3] In its brief, Mistwood states that "[a]t least" dependent claims "such as" claims 3, 8, and 13 of the '386 patent and claims 3, 8, and 13 of the '495 patent address a different technological problem than claim 1 of the '386 patent. D.I. 34 at 5. To the extent that Mistwood intends by the use of such language to suggest that claim 1 of the '386 patent is also not representative of other

Docusign replies that, even for the limited set of claims as to which Mistwood disputes representativeness, Mistwood's arguments fall short because those arguments merely "mistake[ ] additional limitations directed to the same abstract idea for distinctive significance." D.I. 38 at 2.

At the hearing, Mistwood did not identify any of the second email dependent claims discussed in its briefing as asserted claims in this case. Instead, Mistwood stated that these arguments remained relevant for asserted claim 9 of the '386 patent, which was not identified or discussed in the complaint or in Mistwood's briefing.

A patent challenger bears the initial burden to make a prima facie showing that one claim is representative of a group of claims, but "[o]nce this occurs, the burden shifts to the patent owner to present non-frivolous arguments as to why the eligibility of the identified representative claim cannot fairly be treated as decisive of the eligibility of all claims in the group." *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024). "If the patent owner fails to meet its obligation to make non-frivolous arguments in opposition to the representative claim contention, it forfeits its right to argue that the claims in the group identified by the movant are patent eligible even if the representative claim is ultimately found to be ineligible." *Id.* at 1290–91; *see also Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1267 n.2 (Fed. Cir. 2016). Mistwood has not disputed that claim 1 of the '386 patent is representative of all the asserted claims except for claim 9 of the '386 patent. But Mistwood also does not present any argument as to claim 9.

---

claims among the three asserted patents, that is improper. A party cannot put all the claims in all the asserted patents in issue merely by using phrases like "at least" and "such as," unaccompanied by any argument supporting the implied assertion that claim 1 of the '386 patent is not representative of some or all of those unspecified claims.

Accordingly, I conclude that, for purposes of the present analysis, claim 1 of the ’386 patent is representative of the other asserted claims of the ’495, ’385, and ’386 patents, except for claim 9 of the ’386 patent. *See Mobile Acuity*, 110 F.4th at 1290; *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1267 n.2 (Fed. Cir. 2016). Because I am allowing Mistwood to amend its complaint, discussed below, I will withhold consideration of Mistwood’s representativeness argument with regard to claim 9 unless and until it is properly presented by Mistwood.

**2. *Alice* Step One**

Docusign argues that claim 1 of the ’386 patent is directed to providing restricted access to an email message and that the Federal Circuit has held claims similarly directed to “providing restricted access to resources” to be abstract in cases such as *Two-Way Media* and *Prism Technologies LLC v. T-Mobile USA, Inc.*, 696 F. App’x 1014 (Fed. Cir. 2017). D.I. 32 at 11–13. Docusign also argues that the task of restricting access to messages, which is recited in claim 1, is analogous to tasks performed without computers through services such as certified mail. *Id.* at 15. Docusign further argues that claim 1’s limitations are purely functional, confirming the claim’s abstract nature. *Id.* at 15–17.

Mistwood responds that claim 1 of the ’386 patent is not directed to an abstract idea but instead “addresses a technological problem in computer networking (ensuring reliable and transport-layer-protocol-neutral delivery of mandatory receipt confirmation before access is granted) through two specific structural improvements (placement of the acknowledgement command in the user data segment, and placement of the message read indicator in the end-user device).” D.I. 34 at 11. Mistwood contends that claim 1 is similar to the patent-eligible claims in *Ancora Technologies, Inc. v. HTC America, Inc.*, 908 F.3d 1343 (Fed. Cir. 2018), and *KOM*

*Software Inc. v. NetApp, Inc.*, 697 F. Supp. 3d 203 (D. Del. 2023), D.I. 34 at 10–13, and is not similar to the claims in the cases relied on by Docusign, *id.* at 16–17. Mistwood also contends that the analogy to certified mail is an oversimplification of the claim that ignores several differences between certified mail and the method of claim 1. *Id.* at 17–18.

Docusign replies that the asserted claims are not directed to an improvement in computer functionality, but are directed to abstract ideas. Docusign argues that claim 1 does not improve any computer operation, but simply governs when a human recipient may read a message. According to Docusign, the generic components recited in the claims, such as an email, a data field, and a stored flag, perform as they always have. D.I. 38 at 4. The limitations reciting a "user data segment" and a "read message indicator" do not identify "a new protocol, parser, communication architecture, or enforcement mechanism." *Id.* at 5. Docusign contends the claim merely "uses that placement choice to implement the same abstract rule." *Id.*

The *Alice* step-one inquiry considers "what the patent asserts to be the focus of the claimed advance over the prior art." *Yu*, 1 F.4th at 1043 (citation omitted). As noted above, in cases involving computer technology, the Federal Circuit has frequently framed the inquiry at *Alice* step one as asking "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1335–36; *see also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020); *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306–07 (Fed. Cir. 2020); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364–65 (Fed. Cir. 2020); *McRO*, 837 F.3d at 1316; *DDR Holdings*, 773 F.3d at 1257–58.

Claim 1 of the '386 patent is broad, and the principal steps of the claim are quite general in nature. When claims "broadly recite generic steps and results[, ]as opposed to a specific solution

to a technological problem," the claims are more likely to be directed to an abstract idea. *See Universal Secure Registry*, 10 F.4th at 1355.

The method steps of claim 1 are also mainly described in functional terms. Claim 1 recites the following steps at a high level of abstraction: "receiving the email" with "the acknowledgement command," "preventing the display on a screen" of the email content, "authorizing a reply to the acknowledgement request," "enabling the display of the [email] content," and "storing . . . a read message indicator." '386 patent, cl. 1. Those steps describe functional results, rather than describing the means by which those results are accomplished.

Also, the computer components identified in claim 1 are generic; they consist of "device[s]," an "email," a "digital packet" with a "header" and "user data segment," a "user message," an "acknowledgement command," and a "read message indicator." '386 patent, cl. 1. The claim itself states that this communication can take place "by using either simple mail transfer protocol or hypertext transfer protocol." *Id.* The specification allows for the claimed method to be performed by any "communication device[ ]," including "cellular telephones" or "personal digital assistants, laptop computers with Wi-Fi and/or telecommunication carrier communication support, and various types of 'pads,'" and it provides for the method to rely on generic computer hardware such as a "microprocessor," "ROM," "RAM," "nonvolatile data storage," and an "input/output (I/O) module." *Id.* at col. 1, ll. 36–44, col. 5, ll. 24–51. The devices can also run on "a number of different operating systems" that were "known to those skilled in the art." *Id.* at col. 13, ll. 45–51. Furthermore, the specification states that the described method is only an "illustrated example[ ] of delivery confirmation and its attributes apply equally for other formats of communications. That is, a delivery confirmation request utilized in these other formats will generate the same or substantially similar actions." *Id.* at col. 31, ll. 40–44.

The Federal Circuit's decision in *Prism* is instructive. *Prism* claimed a method for controlling access to protected computer resources. The representative claim in *Prism* recited a method consisting of an authentication server (1) receiving identity data from a client computer making a request for resources, (2) authenticating that identity data, (3) authorizing the requested access, and (4) then permitting access to the protected computer resources. The court declined to read those steps as "cover[ing] a concrete, specific solution to a real-world problem." *Prism*, 696 F. App'x at 1017. Instead, the court concluded that the asserted claims were directed to the abstract idea of "control[ling] access to protected computer resources by authenticating identity data," *id.* at 1016, in which computers were "invoked merely as a tool," *Enfish*, 822 F.3d at 1335–36. *See Prism*, 696 F. App'x at 1017 (relying on party briefing that collected "various pre-computer-age corollaries for which humans similarly restrict and provide access to resources"). Like the claims in *Prism*, claim 1 of the '386 patent requires withholding information until the end user authorizes a reply to an acknowledgement request, and if authorized, permitting the requester to access the information.

Similarly, in *Two-Way Media*, the Federal Circuit held claims "directed to methods of sending and monitoring the delivery of audio/visual information" to be abstract. 874 F.3d at 1336 (citation omitted). The court held that the claims were limited to "(1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records about receipt of the sent information," which required merely functional results like "converting," "routing," "controlling," "monitoring," and "accumulating records" without sufficiently describing how to achieve those results in a non-abstract way. *Id.* at 1337 (citation omitted). Like the claims in *Two-Way Media*, claim 1 in the '386 patent calls for a method of sending information by email, monitoring the receipt of that information by requiring

acknowledgements, and accumulating a record of the receipt of the information by creating a record of the acknowledgement.

In response, Mistwood invokes the decision in *TecSec* to argue that the claims asserted in this case are not abstract. In *TecSec*, the Federal Circuit held that claims directed to methods for providing multi-level security in a data network were not directed to an abstract idea. 978 F.3d at 1295–96. The court in *Tec-Sec* noted that in prior cases involving software innovations, the court asked two questions: (1) "whether the focus of the claimed advance [wa]s on a solution to a problem specifically arising in the realm of computer networks or computers," and (2) "whether the claim [wa]s properly characterized as identifying a specific improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function." *Id.* at 1293 (cleaned up). The court in *Tec-Sec* answered both of those questions in the affirmative. As the court explained, the patents at issue in *TecSec* described and claimed a method in which a digital object "is assigned a level of security that corresponds to a certain combination of access controls and encryption." *Id.* at 1282. "The encrypted object can then be embedded or 'nested' within a 'container object,' which, if itself encrypted and access-controlled, provides a second layer of security." *Id.* (citation omitted). The invention in *TecSec* provided a software-based mechanism for enhancing the security of information sent over a network, while providing flexibility to the user; the court therefore held that the invention was fairly characterized as involving a specific improvement in computer capabilities.

The problem addressed by the patents asserted in this case is that "it is not mandatory that the email addressee actually send (permit) the transmission of the requested receipt confirmation, even if the addressee receives and reads the email," and thus, "[f]rom the email originator's perspective, it should not be assumed that the addressee did not receive and/or read the

corresponding email based on the failure of the originator to receive a confirmation of receipt." '386 patent, col. 2, ll. 1–8. To answer the first question addressed by the court in *TecSec*, that is not "a problem specifically arising in the realm of computer networks or computers," *TecSec*, 978 F.3d at 1293 (cleaned up); instead, requiring acknowledgement of receipt before providing access to information is an issue long dealt with in other realms, including with physical mail. *See* D.I. 32 at 15 (discussing the analogous task of requiring acknowledgment of receipt before the delivery of physical mail through the United States Postal Service's certified mail service).

As to the second question addressed by the court in *TecSec*, Mistwood analogizes claim 1 of the '386 patent to the claims at issue in *Ancora* and *KOM Software*. In *Ancora*, the Federal Circuit held that the claimed method "specifically identifies how that functionality improvement is effectuated in an assertedly unexpected way: a structure containing a license record is stored in a particular, modifiable, non-volatile portion of the computer's [Basic Input/Output System ('BIOS')], and the structure in that memory location is used for verification by interacting with the distinct computer memory that contains the program to be verified," which "addresses a technological problem with computers: vulnerability of license-authorization software to hacking." 908 F.3d at 1348–49. Thus, the claim in *Ancora* was inventive because it tied the location choice to a specific technical consequence of the BIOS's architecture.

Mistwood contends that claim 1 includes specific features that result in similar technological improvements. First, Mistwood points to "the user data segment," which Mistwood argues ensures reliable transmittal of command and control information to end-user devices together with the user message, regardless of the transport-layer protocol used. D.I. 34 at 11–12 (citing '386 patent, col. 7, ll. 6–30, col. 17, line 40 through col. 18, line 36). Second, Mistwood points to the "read message indicator," which is stored locally in the end user device, and the stored

indicator gates display of the stored message and is checked on each access attempt until authorization is given. D.I. 34 at 12 (citing ’386 patent, col. 7, ll. 6–30, col. 17, line 40 through col. 18, line 36).

To show that the’386 patent claims are not directed to an abstract idea, Mistwood focuses on the first limitation of claim 1, which recites that the claimed method comprises “receiving the email that comprises a digital packet having a header and a user data segment, the user data segment containing a user message and an acknowledgement command where the acknowledgement command conveys a request from an originating device to acknowledge receipt of the subject email.” The specification explains the reason for locating the acknowledgement command in the user data segment of the digital packet. ’386 patent, col. 6, ll. 29–31. The specification explains:

> Because the data segment **402** is totally encapsulated within the user data portion **306** . . . the data segments **402** are simply treated as conventional user data by the telecommunication infrastructure nodes which pass the encapsulated data segments **402** from an originating user device to a terminating user device. Only the end user communication devices process the data segments using the enhanced services application program and implement action corresponding to any command and control information contained within the data segment **402**, as well as providing the user with any user message included in a user data segment.

*Id.* at col. 7, ll. 19–30.

Mistwood explains that the claimed system, by including the routing information in the data segment rather than in the header of the digital packet, ensures that the mandatory receipt confirmation requirement will be included “over various transport-layer communication protocols,” D.I. 34 at 12, as the placement of “the acknowledgement command within the user data segment together with the user message [ensures] reliable, transport-layer-protocol-neutral delivery and handling of the *mandatory* command before access to the user message can be granted.” *Id.* at 9–10. In addition, claim 1 provides for the “read message indicator” that enables

"the device [to] re-prompt[ ] for authorization on each subsequent attempt to access the message until the mandatory command is satisfied, even if the recipient declines authorization upon initial receipt of the message." *Id*. at 10. Thus, Mistwood contends, claim 1 of the '386 patent is similar to the claim at issue in *Ancora* and is directed to a solution to a computer functionality problem.

As for *KOM Software*, in that case I held claims that recited the specific use of a "trap layer" to be patent-eligible because the claims were "directed to specific mechanisms for performing the recited function." 697 F. Supp. 3d at 214–15 ("Put simply, the claims of the '243 patent recite the use of a trap layer, which the specification of that patent discloses as the principal means for solving the problems associated with prior art storage devices."). I held other claims in that case to be patent-ineligible because they only generically recited "providing an indication" that covers "essentially any method" of achieving the desired result. *Id.* at 216. Mistwood argues that the recitation of the two specific placements in claim 1 of the '386 patent provides at least the same level of detail as the specific mechanism of the "trap layer" in *KOM Software*.

It is clear that the principal concept of claim 1 is directed to the abstract idea of providing restricted access to an email message. What is not clear on this record is whether there is enough specificity offered by the "user data segment" to save the claim from abstraction. However, I do not need to decide that question now because I find a "material issue of fact remains to be resolved," *Jablonski*, 863 F.2d at 290 (citation omitted), at *Alice* step two, discussed below. *See CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) (explaining that the court would not reach an answer on *Alice* step one where the claim survived on *Alice* step two).

### 3. *Alice* Step Two

Docusign argues that the asserted claims fail at step two of *Alice* because the claims require "nothing more than conventional computer equipment, running a well-known communication protocol, and performing its ordinary functions." D.I. 32 at 17–18. Docusign asserts that the step two issue can be resolved on the pleadings because Mistwood has not raised any factual issues that would bar a dispositive ruling against Mistwood on that issue. *Id.* at 20–21.

Mistwood responds that the claimed improvements—i.e., "the placement of the acknowledgement command in the user data segment and the placement of the message read indicator on the end-user device"—are unconventional within the meaning of the step two analysis because "the same specific techniques that render the claim non-abstract also supply elements beyond the abstract idea itself." D.I. 34 at 19. Mistwood also argues that Docusign (1) has not offered any evidence that the claims were well-understood, routine, or conventional; (2) has ignored the claimed ordered combination; and (3) has not addressed the specification's account of why that combination is non-conventional. *See id.* at 19–21. As a result, Mistwood asserts, there is a factual dispute over conventionality that precludes entry of judgment on the pleadings.

Mistwood analogizes this case to *CosmoKey Solutions*, in which the Federal Circuit held that the relevant claims recited an inventive concept because the claims and specification provided "a specific improvement to authentication that increases security, prevents unauthorized access by a third party, is easily implemented, and can advantageously be carried out with mobile devices of low complexity." D.I. 34 at 20 (quoting 15 F.4th at 1098). In *CosmoKey*, the Federal Circuit determined that the claims contained an inventive concept within the meaning of *Alice* step two because the claims recited the specific, ordered steps of (1) "as a criterion for deciding whether the authentication to the transaction shall be granted or denied, having the authentication device check

whether a predetermined time relation exists between the transmission of the user identification and a response from the second communication channel"; (2) "ensuring that the authentication function is normally inactive and is activated by the user only preliminarily for the transaction"; followed by (3) "ensuring that said response from the second communication channel includes information that the authentication function is active"; and (4) "thereafter ensuring that the authentication function is automatically deactivated," with nothing in the record suggesting these were conventional. 15 F.4th at 1098–99 (citation omitted). The eligibility-conferring improvement to authentication was set out in the claim as a series of non-conventional, ordered steps.

Docusign responds that a rationale that fails to establish a specific technical improvement at step one cannot resurface as an inventive concept at step two, *see Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1363 (Fed. Cir. 2020), and that the claims in this case merely recite conventional computer operations, not an inventive concept. D.I. 38 at 7–8. Docusign further contends that the features Mistwood invokes in its briefing—protocol-neutral operation, protocol conversion, interoperability across transport protocols, multi-device synchronization, or enhanced services application—all appear in the specification but not in claim 1 or claim 3. *Id.* at 9. Finally, Docusign argues that Mistwood has not established that there is a factual dispute as to step two of *Alice*, as the complaint does not contain specific, non-conclusory factual allegations of unconventionality. *Id.* In particular, Docusign argues that Mistwood's complaint does not expressly plead that either the placement of the acknowledgement command in the user data segment of the digital packet or the placement of the message read indicator on the end user-device were unconventional as of the patents' priority dates. In support of that argument, Docusign has

cited the Federal Circuit's decisions in *Aatrix* and *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019).

Following oral argument on the motion for judgment on the pleadings, I requested that the parties provide submissions addressing whether Mistwood had satisfied the requirement to adequately allege that the asserted claims satisfied step two of *Alice* by showing that the claims contained an inventive concept. In particular, I requested briefing on whether Mistwood had adequately alleged that the idea of placing the acknowledgement command in the user data segment of the transmitted packet instead of in the header was sufficient to avoid judgment at the pleading stage of the case.

In its response to that request, Mistwood cited the prosecution history of the '386 patent, *see* D.I. 56, in which the applicant distinguished a prior art reference on the ground that the acknowledgement command in the '386 patent "resides in the user data segment of the digital packed as opposed to being in the header of the packet," which the applicant asserted "ensures that it will be faithfully delivered to the recipient end-user device." D.I. 56-1 at 68 (emphasis removed). That feature, the applicant explained, "provides an advantage with regard to placing information in the header portion of the packet because various communication networks and servers process and/or transfer information contained in the header of the packet in substantially different ways." *Id.*

Docusign responded by arguing that the alleged inventive concept of placing the acknowledgement command in the data segment portion of the packet rather than in the header was not an inventive concept. *See* D.I. 57. Docusign based that argument on a prior art U.S. patent application publication, Pub. No. US 2007/0136430 to Qureshi, which stated that an insert such as

a request for delivery confirmation could be inserted into either the body of an email or the header. D.I. 57-2 at ¶¶ 2, 4, 42, and claim 12.

In *Aatrix*, the Federal Circuit noted that it had held that "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." 882 F.3d at 1126–27 (citing *BASCOM*, 827 F.3d at 1352). The court noted, however, that allowing Aatrix to file an amended complaint alleging "facts directed to the inventive concepts in its claimed invention, would not be futile." 882 F.3d at 1127. And in *Cellspin*, the court noted that "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to defeat a motion to dismiss and that "factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101." 927 F.3d at 1317–18.

Mistwood's complaint does not contain any allegations expressly addressed to the "inventive concept" requirement of step two of *Alice*. However, in both the *Aatrix* and *Cellspin* cases, the plaintiff had either filed an amended complaint after the defendant's motion to dismiss was filed (as in *Cellspin*) or the court ruled that the plaintiff would be allowed to file such an amended complaint to address the motion to dismiss after concluding that such an amendment would not be futile (as in *Aatrix*).

Allowing the filing of an amended complaint after a section 101 challenge is raised in a pleadings motion is entirely appropriate in light of the principles governing such motions. As a general rule, there is no basis for imposing on the plaintiff an obligation to anticipate an affirmative defense and address it in the complaint. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 702 (2025); *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 435 n.9 (2017) (explaining that an "affirmative defense" is "not something the plaintiff must anticipate and negate in her pleading"); *Gomez v Toledo*, 446 U.S. 635, 640 (1980); *United States ex rel. O'Connor v. U.S. Cellular Corp.*, 153

F.4th 1272, 1277 (D.C. Cir. 2025) ("A complaint need not 'anticipate and negate' affirmative defenses."); *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 36 n.4 (Fed. Cir. 2024) (same); *Burrell v. Staff*, 60 F.4th 25, 34 (3d Cir. 2023) ("[A] complaint need not anticipate or overcome affirmative defenses[ ] to state a claim for relief and defeat a Rule 12(b)(6) motion to dismiss." (citation omitted)); *Nobre ex rel. K.M.C. v. La. Dep't of Pub. Safety*, 935 F.3d 437, 442 n.20 (5th Cir. 2019); *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) ("A plaintiff need not anticipate in the complaint an affirmative defense that may be raised by the defendant; it is the defendant's burden to plead an affirmative defense."); *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) ("complaints need not anticipate defenses"). To dismiss the complaint in this case on the ground that it does not rebut the defendant's section 101 defense would be contrary to those authorities and contrary to the practice recognized by the Federal Circuit of allowing a plaintiff to file an amended complaint in response to a section 101 defense as long as filing such an amended complaint would not be futile.

It may be that it will ultimately be determined, as Docusign contends, that the asserted claims do not survive analysis under *Alice*, but that determination cannot be made at this juncture based on Mistwood's failure to plead compliance with section 101 in its complaint, even in light of the limited briefing ordered by the court after the oral argument on Docusign's motion for judgment on the pleadings.

Accordingly, Mistwood will be given an opportunity to file an amended complaint addressing Docusign's section 101 defense. The amended complaint will be due for filing within 10 days of the filing of this order.

## IV. Motion to Stay

Docusign moved to stay the case pending the resolution of its motion for judgment on the pleadings challenging the eligibility of all the asserted claims. D.I. 43, 44. Docusign argued that staying the case was justified because its motion for judgment on the pleadings was fully dispositive of the case, the case was still in its early stages, and the plaintiff would suffer no prejudice from a short delay at this point in the proceedings. D.I. 44 at 4.

Based on the analysis of the section 101 issue, it is clear that the motion to stay the proceedings is moot. More generally, however, issuing a stay of proceedings pending the disposition of a motion to dismiss under Rule 12(b)(6) or 12(c) will rarely be justified. The risk of inviting parties to seek stays with every pending dispositive motion outweighs any early litigation costs a defendant will incur.

## V. Conclusion

The court denies, for now, the defendant's motion for judgment on the pleadings on the ground that the asserted claims are all patent-ineligible under 35 U.S.C. § 101. The plaintiff will be granted leave to file an amended complaint responding to the section 101 defense. The motion for a stay is denied.

IT IS SO ORDERED.

SIGNED this 9th day of November, 2026.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE